FILED

06 NOV 21 AM 9: 15

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 05CR2239 BEN |
| Plaintiff, | ORDER [Doc. No. 33-1, 33-5, 33-6] |
| v. | |
| EMILIO REYES-BOSQUE (1), JOSE LUIS RAMIREZ-ESQUEDA (2), JOSE ANGEL RIVAS-POZOS (3), | |
| Defendants. | |

## I. INTRODUCTION

Defendant Emilio Reyes-Bosque ("Reyes-Bosque") moves to suppress evidence and statements collected by United States Border Patrol Agents on December 2, 2005 when they arrested him along with defendants Jose Luis Ramirez-Esqueda ("Ramirez-Esqueda") and Jose Angel Rivas-Pozos ("Rivas-Pozos") (collectively, "defendants"). The defendants are charged with six counts each of "bringing in aliens for financial gain" in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and aiding and abetting in violation of 8 U.S.C. § 2; and "harboring illegal aliens" in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and aiding and abetting in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II). Defendants Ramirez-Esqueda and Rivas-Pozos join the motions to suppress. On June 23, 2006, August 4, 2006 and October 26, 2006, an evidentiary hearing was held where the Court heard the testimony of several witnesses, as well as extensive arguments from counsel for the government and the defendants.

05CR2239 BEN

## II. FACTS

On December 2, 2005, Border Patrol Agents observed two men and one woman walking on Main St. in Brawley, California. The individuals appeared to be lost and were walking aimlessly. When they saw the Border Patrol Agents, they turned in the opposite direction. The agents followed them to Garcia's Market, where the two men sat outside while the woman went inside. The agents identified themselves to the men, who then went inside the market. The agents followed them in, where they again identified themselves in English and in Spanish and asked the men and the woman to step outside. Once outside, the agents questioned the individuals about their documentation and whether they were here legally. The three admitted they were not here legally, and they were Mexican citizens. The agents then arrested them.

Once they were in the agents' vehicle, the woman informed the agents that they had escaped from a house a few miles away, and that there were approximately 20 more people there. The woman directed the agents to the house where she indicated they had been held, located at 362 Wilson Avenue in Brawley. When they arrived, she informed the agents that she didn't want to get out of the car because she was scared. The agents called for backup, and when the additional agent arrived, they drove around so they would have a view of the residence at 362 Wilson Ave. When they had a view of the residence from the car, the woman told the agents that an individual outside the residence was the caretaker of the apartment from which they had escaped. The individual she pointed out was defendant Rivas-Pozos.

Agent Martinez approached Rivas-Pozos, identified himself in English and in Spanish, and began to question him. Rivas-Pozos informed Agent Martinez that he lived in El Centro, California, but provided an I.D. with the address 362 Wilson Avenue, arousing the agent's suspicion. Upon further questioning, Rivas-Pozos told the agent that he was visiting his godfather at 362 Wilson Avenue, Unit 3. At that point, Agent Perez, who had arrived as backup, accompanied Rivas-Pozos to Unit 3 to verify his story, while the other agents went to Unit 4 where they had been informed the aliens were being held.

At Unit 3, Rivas-Pozos and Agent Perez knocked on the door repeatedly until a woman answered the door. Agent Perez identified himself, and told her he was trying to verify Rivas-

1   Pozos's story. He then asked the woman for identification, in response to which she produced
2   what the agent believed to be a Mexican border card. He inquired whether she had immigration
3   documents and she admitted that she did not. She told Agent Perez that her husband, defendant
4   Reyes-Bosque, was inside the house, and he then came to the door. When Agent Perez questioned
5   Reyes-Bosque about Rivas-Pozos, Reyes-Bosque informed him that Rivas-Pozos was a friend, not
6   his godson. Agent Perez asked Reyes-Bosque for identification and then immigration documents,
7   in response to which he provided a California driver's license and a valid immigration document.
8   Upon receipt of the immigration documents, Agent Perez performed a record check and was
9   informed that Border Patrol had stopped vehicles in the past that had taken them to 362 Wilson
10  Avenue, and the occupants of those vehicles said they had made arrangements with a man named
11  Emilio.

12      Agent Perez then informed Reyes-Bosque that he was arresting his wife because she lacked
13  immigration documents. Reyes-Bosque's wife had recently given birth to the couple's son. Agent
14  Perez then told her that if she wished to take the baby with her, he would have to search the house
15  to make sure she wasn't going to grab any weapons. Otherwise she would have to leave the baby
16  with her sister, who was also in the house. She decided to take the baby, and Agent Perez
17  proceeded to search the house. He discovered defendant Ramirez-Esqueda in one of the bedrooms,
18  covered up in the bed. When asked for I.D., Ramirez-Esqueda produced a Mexican passport with
19  a valid visa. In response to questioning, he told Agent Perez he was a family friend and was just
20  visiting. Agent Perez instructed him to stay put, performed a record check, and discovered that
21  Ramirez-Esqueda had been arrested by Border Patrol in 2001 for alien smuggling.

22      Once Reyes-Bosque's wife collected her belongings, Agent Perez took Ramirez-Esqueda
23  outside and began questioning him again. Ramirez-Esqueda repeated that he was just visiting, then
24  after Agent Perez brought up his previous arrest and asked if he was smuggling again, Ramirez-
25  Esqueda admitted that he worked for "him", and that he got paid $100 to check if the checkpoint
26  was up or down.

27      At the same time that Agent Perez was at Unit 3 with Rivas-Pozos, Agents Martinez and
28  Rodriguez approached Unit 4, where they understood the aliens to have escaped from, and where

1  the other aliens were being held.  Agent Martinez positioned himself at the back of the house,
2  while Agent Rodriguez proceeded to the front where he knocked and identified himself as a border
3  patrol agent in English and in Spanish.  When Agent Rodriguez knocked at the front door, Agent
4  Rodriguez observed a small window in the back open and a man pop his head out, as if he was
5  trying to escape.  As soon as the individual observed Agent Martinez there, he withdrew and shut
6  the window.  Agent Martinez informed Agent Rodriguez of what he had just seen, after which
7  Agent Rodriguez entered the premises, identified himself, and Agent Martinez followed him in.
8  The agents questioned the individuals in Unit 4 and ascertained that they were aliens, then did a
9  room to room sweep to gather everyone into one area while awaiting transport.  While Agent
10  Martinez was processing the aliens, another agent searched Unit 4 and seized a ledger, a list of
11  what he suspected to be alien names, California maps and a paper document that appeared to be
12  instructions for drivers of aliens.

13       The defendants were transported back to the Border Patrol station, where they were read
14  their *Miranda* rights in Spanish.

15                              **III. DISCUSSION**

16       Defendants ask the Court to suppress the evidence and statements resulting from the
17  searches of Units 3 and 4 at 362 Wilson Avenue.  Reyes-Bosque also asks the Court to suppress
18  any fruits of his arrest on the basis that the agents lacked probable cause when they arrested him.

19       *A.*    *Unit 4*

20            *1.*   *Standing*

21       To invoke the protection of the Fourth Amendment, a person must show that he or she has
22  a legitimate expectation of privacy.  A legitimate expectation of privacy encompasses two
23  requirements: (1) the individual's subjective expectation that his activities would be private; and
24  (2) that this expectation is one that society recognizes as reasonable.  *Unites States v. Bautista,* 362
25  F.3d 584, 589 (9th Cir. 2004) (citing *United States v. Nerber,* 222 F.3d 597, 599 (9th Cir. 2000)).
26  This Court has been skeptical that any defendant actually has standing to assert a Fourth
27  Amendment violation with regard to Unit 4.  Prior to the filing of supplemental briefing, of the
28  three defendants, only Rivas-Pozos made any claim of an expectation of privacy in Unit 4.  In

1  response to that claim, the Court made substantial efforts to elicit from Rivas-Pozos the basis for
2  his assertion of standing.  No offer of testimony was made, and only after counsel engaged in
3  extensive argument would Rivas-Pozos agree to submit a sworn declaration of the basis for his
4  assertion of standing.  The Court bent over backwards to allow Rivas-Pozos to make his best claim
5  of standing, in spite of his refusal to support the claim in any way that could be cross-examined by
6  the government.

7         Rivas-Pozos argues that he stayed in Unit 4 from time to time, that his California
8  identification listed his address as 362 Wilson Avenue, and that at some point prior to his arrest he
9  obtained a cable subscription at that address.  Additionally, he argues that the material witness
10 identified him as the "caretaker" of Unit 4 when she and the other aliens were being held there.
11 However, at the time of the search, he informed the Border Patrol Agents that he lived in El
12 Centro, and was staying with his godfather in Unit 3, not Unit 4.  Putting aside his conflicting
13 claims about where he was staying, Rivas-Pozos still does not establish a legitimate expectation of
14 privacy in Unit 4.

15        This situation is strongly analogous to that in *Minnesota v. Carter*, 525 U.S. 83, 90-91
16 (1998).  In that case, defendants attempted to assert Fourth Amendment standing over an apartment
17 in which they were bagging cocaine.  Defendants were present in the apartment for a short time,
18 and solely for that commercial purpose.  The Court held that while the apartment was somebody's
19 home, the defendants were not there as overnight guests, but solely for a commercial purpose and
20 therefore had no legitimate expectation of privacy in the apartment.  *Id.*  Here, all indications are
21 that Unit 4 was used as a load house for alien smuggling.  While Unit 4 is technically a residence,
22 it was not Rivas-Pozos's residence, and its use was purely commercial in nature.  Even if Rivas-
23 Pozos stayed in Unit 4 the night before, he did so not as an overnight guest, but as "caretaker" of
24 the aliens being stashed there - in the context of alien smuggling, this is the equivalent of bagging
25 cocaine - he was supervising the merchandise.  The Court therefore finds that he did not have a
26 legitimate expectation of privacy in Unit 4.  *See Minnesota v. Carter*, 525 U.S. at 90-91.

27        In addition to Rivas-Pozos's claim, Reyes-Bosque for the first time also asserts standing
28 with respect to Unit 4 in his September 8, 2006 Supplemental Memorandum.  Reyes-Bosque's

1  newly asserted claim rests on his payment of rent for Unit 4 from January 2005 through August
2  2005. Payment of rent can be a "significant" factor in whether a subjective expectation of privacy
3  exists, and whether that expectation is one recognized by society as reasonable. *See U.S. v. Davis,*
4  932 F.2d 752, 757 (9th Cir. 1991) (finding assumption of ongoing obligation to pay rent a
5  "significant" factor in determining legitimate expectation of privacy). In this case however, for
6  several reasons it is not sufficient to provide Reyes-Bosque with standing to challenge the search
7  of Unit 4.

8       First, Reyes-Bosque submits no evidence that he was paying rent for Unit 4 *at the time of*
9  *the search*. The evidence he submits in fact establishes that someone by the name of Contreras
10  was paying the rent at that time. If anything, the evidence submitted by Mr.Reyes-Bosque
11  indicates that any expectation of privacy he may have had no longer existed in December 2005 and
12  supports a finding that Unit 4 was being used as a safe house, not a residence. Second, payment of
13  rent by itself does not establish a legitimate expectation of privacy when the person paying rent
14  clearly does not live in the residence. It is undisputed that Reyes-Bosque resides in Unit 3. He
15  does not claim to also live in Unit 4, or to stay overnight there, nor does he give any other
16  explanation of what he does there that would garner a legitimate expectation of privacy. Reyes-
17  Bosque does not have a legitimate expectation of privacy in Unit 4, and therefore lacks standing to
18  challenge the search.

19       Because none of the three defendants have established standing under the Fourth
20  Amendment to challenge the search of Unit 4, all evidence seized from Unit 4 will be admitted.

21       2.    *Exigency*

22       Even if the Court did find that either Reyes-Bosque or Rivas-Pozos had standing to
23  challenge the search of Unit 4, the search would still be reasonable because the agents entered the
24  premises on the basis of exigent circumstances. "As a general rule, 'we define exigent
25  circumstances as those circumstances that would cause a reasonable person to believe that entry ...
26  was necessary to prevent physical harm to the officers or other persons, the destruction of relevant
27  evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate
28  law enforcement efforts.'" *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004) (quoting

1    *United States v. McConney*, 728 F.2d 1195. 1199 (9th Cir. 1984) (en banc).

2        In this case, the cause of the exigency was a fear of harm to other persons, namely the

3 approximately 20 aliens the agents believed to be captive in Unit 4. When the agents picked up the

4 three aliens in downtown Brawley, the woman informed them that the three had escaped from a

5 house where there were another 20 aliens being held, and when the agents brought her back to the

6 site, she told them she was scared to go in. These facts alone are enough to cause a reasonable

7 person to believe that entry into Unit 4 would be necessary to prevent harm to others. "An action

8 is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, 'as

9 long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City, Utah v. Stuart*,

10 126 S.Ct. 1943, 1948 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (emphasis

11 in original). The Court finds that the circumstances indicated a hostage situation was likely, and

12 the agents' actions were therefore objectively reasonable. The evidence obtained from Unit 4 is

13 therefore admissible on the basis of the exigency exception to the warrant requirement.[1]

14        *B.*     *Unit 3*

15        *1.*     *Entry*

16        Defendants Ramirez-Esqueda and Reyes-Bosque challenge the initial entry into Unit 3 by

17 Agent Perez. They claim that the entry was a search for Fourth Amendment purposes, the agents

18 had no warrant, and the entry does not fall under any exception to the warrant rule. The

19 government argues that the entry was consensual.

20        In *United States v. Winsor,* 846 F.2d 1569, 1572-73 (9th Cir. 1988) (en banc), the Ninth

21 Circuit held that police conducted a search for Fourth Amendment purposes when they demanded

22 the defendant open the door, and then visually inspected his hotel room through the open door.

23 The court found that whether they entered the room was irrelevant. This holding was recently

24 confirmed in *United States v. Bautista*, 362 F.3d 584, 591 (9th Cir. 2004). In *Bautista*, the court

25 held that when the officers stated "San Diego police. Open the door.", they were commanding that

26 the door be opened under claim of lawful authority. Compliance with that demand cannot be

27

28      [1] The Court notes that the evidence regarding exigent circumstances was sufficiently strong that it arrives at its conclusions without need for consideration of Agent Rodriguez's declaration or testimony.

       05CR2239 BEN

1  considered consent, and the search was therefore illegal. *Id.*

2          In this case, Agent Perez approached the door of Unit 3 with defendant Rivas-Pozos in

3  order to verify Rivas-Pozos's story that he was staying there with his godfather. Rivas-Pozos was

4  the first to knock on the door, followed by Agent Perez, who stated "Border Patrol, open the door."

5  or words to that effect. After several minutes of knocking, Reyes-Bosque's wife opened the door.

6  Initially, this would appear to be factually similar to the situation in *Bautista*. However, one

7  critical fact sets it apart - the record is undisputed that Reyes-Bosque's wife did not speak English.

8  Unlike all other initial interactions between the agents and the defendants or material witnesses,

9  Agent Perez's testimony does not indicate that he made his command in any language other than

10  English. Therefore, unlike in *Winsor* or *Bautista*, she was not opening the door in response to the

11  claim of lawful authority, *because she didn't understand it.* Rather, she simply opened the door in

12  response to the repeated knocking, which is a voluntary action. *See United States v. Winsor,* 846

13  F.2d at 1573 (citing *Davis v. United States,* 327 F.2d 301, 303 (9th Cir. 1964)) (occupant opening

14  the door in response to police knocking is consensual). The initial entry into Unit 3 did not run

15  afoul of the Fourth Amendment.

16          Alternatively, Agent Perez had reason to believe that the same exigent circumstances

17  present at Unit 4 could be present at Unit 3. The material witnesses indicated that they had been

18  held in Unit 4 with a large number of other aliens, and that Rivas-Pozos was the "caretaker". It

19  was the job of the "caretaker" to make sure nobody left. (Def. Ex. O at 0032). When the agents

20  first spoke with Rivas-Pozos, after he was identified by the material witnesses, he told them he was

21  staying in Unit 3, not Unit 4. Having already been informed that people were being held against

22  their will in Unit 4, and then being told by the person doing the holding that he was staying in Unit

23  3, a reasonable agent would come to the conclusion that it was likely people were being held in

24  Unit 3 as well. *See U.S. v. Black,* — F.3d —, 2006 WL 3026026 at *1 (9th Cir. Oct. 26, 2006)

25  (finding that exigent circumstances justified warrantless entry and search when police might have

26  reasonably believed injured woman was inside apartment).

27          Even if the initial entry did constitute a potential Fourth Amendment violation, exclusion

28  would not be the appropriate remedy in this case. Whether exclusion is the appropriate sanction is

1  a separate question from whether a Fourth Amendment violation has occurred. *United States v.*
2  *Leon,* 468 U.S. 897, 906 (1984). As articulated in the Supreme Court's recent decision in *Hudson*
3  *v. Michigan*, "[s]uppression of evidence, however, has always been our last resort, not our first
4  impulse." 126 S. Ct. 2159, 2163 (2006). The exclusionary rule is only to be applied where "its
5  deterrence benefits outweigh its substantial social costs". *Id.* (citing *Pennsylvania Bd. of*
6  *Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998)).

7          In this case, the Court must consider what behavior it would be deterring by excluding the
8  evidence found after entry into Unit 3. When Agent Perez approached Unit 3 with Rivas-Pozos,
9  his stated purpose was to follow-up on Rivas-Pozos's claim that he was staying there with his
10 godfather. Rivas-Pozos had been identified by the material witness as the "caretaker" who kept the
11 illegal aliens in Unit 4. When the agents discovered Rivas-Pozos outside, they could have arrested
12 him. However, instead of arresting him immediately, the agents chose to follow up on his claim,
13 which had it turned out to be true, could have exculpated him on the spot. The Court finds it
14 difficult to fathom how this is behavior on the part of law enforcement that we would want to
15 deter. Common sense dictates that giving a suspect an opportunity to clear himself before arresting
16 him is better for the suspect than arresting him, putting him through booking, and then attempting
17 to corroborate his story later. Exclusion of the initial entry into Unit 3 therefore provides no
18 deterrence benefits, particularly when weighed against the tremendous social costs.

19          2.     *Search of Unit 3*

20          After Reyes-Bosque's wife opened the door, Agent Perez asked her for identification. He
21 then realized that she did not speak English and questioned her in Spanish regarding immigration
22 documents. She admitted to not having any, and then Reyes-Bosque came to the door. Agent
23 Perez informed Reyes-Bosque he would have to arrest his wife. The agent told her that if she
24 wished to take her baby with her, instead of leaving him with her sister, he would have to search
25 the apartment for officer safety. She chose to take the baby with her, and Agent Perez walked into
26 one of the bedrooms, where he discovered defendant Ramirez-Esqueda in bed.

27          Ramirez-Esqueda challenges the search that led to his discovery in the bedroom on the
28 basis that Agent Perez lacked a warrant or an exception to the warrant requirement to search the

1   house. The government argues that having placed Reyes-Bosque's wife under arrest, Agent Perez

2   had the right to accompany her into the house while she collected whatever belongings she wished

3   to take with her. Under *Washington v. Chrisman,* 455 U.S. 1, 6 (1982), an arresting officer has a

4   right "to remain literally at [the arrested person's] elbow at all times" including when the arrested

5   person returns to a private area to obtain identification or anything else. The Court found that this

6   authority did not depend on the degree of potential danger, the likelihood of escape, or the nature

7   of the offense. *Id.* Had Agent Perez actually accompanied Reyes-Bosque's wife into the

8   apartment while she collected her belongings, there would be little question that his actions fell

9   under the allowance created by *Washington v. Chrisman. Id.* But Agent Perez's testimony does

10  not support that interpretation of the facts. Rather, it appears that Agent Perez independently

11  conducted a sweep of the apartment to check for weapons for his safety.

12          The Court finds that while this does not fit into the rubric of *Washington v. Chrisman*, it

13  does qualify as a protective sweep, and is therefore allowable under the Fourth Amendment. A

14  protective sweep is defined as "a quick and limited search of premises, incident to an arrest and

15  conducted to protect the safety of police officers and others." *Maryland v. Buie*, 494 U.S. 325, 327

16  (1990). The rationale for allowing such a search flows from the Court's decisions in *Terry v. Ohio*,

17  392 U.S. 1 (1968) and *Michigan v. Long*, 463 U.S. 1032 (1983), which allowed for a brief

18  intrusion of personal privacy that was no more than necessary to protect the officer from harm.

19  *Maryland v. Buie*, 494 U.S. at 333. The protective sweep allows officers to conduct a warrantless

20  cursory inspection of those places where a person may be found, during or after an arrest. *Id.* at

21  335. In order to conduct a protective sweep, "there must be articulable facts which, taken together

22  with the rational inferences from those facts, would warrant a reasonably prudent officer in

23  believing that the area to be swept harbors an individual posing a danger to those on the arrest

24  scene." *United States v. Paopao*, 465 F.3d 404, 410 (9th Cir. 2006) (quoting *Buie*, 494 U.S. at

25  334). It does not matter whether the arrest takes place inside or immediately outside the home.

26  *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989) ("[a] bullet fired at an arresting officer

27  standing outside a window is as deadly as one that is projected from one room to another.").

28          In this case, Agent Perez explained to Reyes-Bosque's wife that if they were not going to

- 10 -

1 | immediately leave the premises, he would have to search the apartment for his safety. The totality
2 | of the circumstances create a reasonable suspicion of danger on the part of Agent Perez. When
3 | Reyes-Bosque came to the door, Agent Perez ran a record check and discovered that he had an
4 | extensive criminal and immigration history. (Def. Ex. O at 0033). Agent Martinez testified that
5 | before arriving at 362 Wilson Ave., he had been informed that it was dangerous, and the block had
6 | been the site of a shootout recently. Further, Agents Castro and Leyba were aware that 362 Wilson
7 | Ave. had been used to harbor aliens in the past, and that several people had previously stated that
8 | Reyes was the person in charge of the smuggling operation. While some of this information was
9 | known initially to individual agents, it is considered to be collective knowledge. *See Illinois v.*
10 | *Andreas,* 463 U.S. 765, 772 n.5 (1983) ("where law enforcement authorities are cooperating in an
11 | investigation, as here, the knowledge of one is presumed shared by all."); *see also United States v.*
12 | *Jensen,* 425 F.3d 698, 705 (9th Cir.2005) (reaffirming "collective knowledge doctrine"). When
13 | taken together, these facts, as well as the inferences that may be drawn from them, create a
14 | reasonable suspicion that there could be another individual in the residence posing a danger to the
15 | agent. *See Paopao,* 465 F.3d at 410. The protective sweep of Unit 3 was therefore justified, and
16 | the evidence in Unit 3, including the discovery of Ramirez-Esqueda, will not be suppressed.

17 |    C.    *Ramirez-Esqueda's Statements*

18 |       Ramirez-Esqueda made several statements while still at 362 Wilson Ave. that he now
19 | moves to suppress. He claims that he was in "de facto custody" at the time, and he was not given
20 | *Miranda* warnings. The record is undisputed that Agent Perez did not administer *Miranda*
21 | warnings while speaking with Ramirez-Esqueda at 362 Wilson Ave. What is disputed is whether
22 | the situation required them.

23 |       The Supreme Court held in *Miranda v. Arizona* that a person questioned by law
24 | enforcement officers after being "taken into custody or otherwise deprived of his freedom of action
25 | in any significant way" must first "be warned that he has a right to remain silent, that any statement
26 | he does make may be used as evidence against him, and that he has a right to the presence of an
27 | attorney, either retained or appointed." 384 U.S. 436, 444 (1966). In the years since the Court's
28 | ruling in *Miranda,* it has clarified that those requirements only apply to a custodial interrogation.

1    "In determining whether an individual was in custody, a court must examine all of the
2    circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was]
3    a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."
4    *Stansbury v. California,* 511 U.S. 318, 322 (1994) (internal quotations and citations omitted).  As
5    noted by the Ninth Circuit, there are many situations in which a person is detained but not in
6    custody, including *inter alia*, traffic stops, border crossings, and *Terry* stops.  *See United States v.*
7    *Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).  Not every situation in which an individual does not
8    feel free to leave is the equivalent of custody, but rather may fall somewhere "in the twilight zone
9    between detention and custody," thereby triggering an inquiry into the objective circumstances of
10   the interrogation.  *Id.* at 1099.

11          Factors relevant to whether an individual is in custody include: "(1) the language used to
12   summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt;
13   (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the
14   degree of pressure applied to detain the individual."  *United States v. Beraun-Panez,* 812 F.2d 578,
15   580 (9th Cir. 1987) (internal citations omitted); *see also United States v. Hayden,* 260 F.3d 1062,
16   1066 (9th Cir. 2001) (same).  These five factors help to create an objective picture of the
17   circumstances under which an individual was interrogated, and whether, regardless of the
18   individual's subjective feelings or the officer's intentions, the situation was sufficiently akin to
19   formal arrest as to trigger the need for *Miranda* warnings.

20          In this case, the "language used to summon" Ramirez-Esqueda is not particularly
21   aggressive or custodial in nature.  Agent Perez discovered Ramirez-Esqueda in bed, so he was not
22   initially summoned, in a traditional sense.  Ramirez-Esqueda removed the covers of his own
23   volition, and Agent Perez instructed him to keep his hands visible.  Agent Perez also instructed
24   him to stay seated on the bed while he called in a records check.  After the initial interaction in the
25   bedroom, Agent Perez instructed Ramirez-Esqueda to come with him, and then "told him to step
26   outside so we could talk." (Govt. Ex. 8 at 678).  They went out into the driveway of Unit 3, where
27   in response to questioning, Ramirez-Esqueda made the statements at issue.  There is no indication
28   in the record that Agent Perez's tone was threatening or domineering.  The Court finds that the

- 12 -

1   language used to summon Ramirez-Esqueda was not indicative of a custodial situation.

2          The second factor the Court may consider is the extent to which Ramirez-Esqueda was

3   confronted with evidence of guilt. It appears from the record that the only reference to any crime

4   made by Agent Perez was to Ramirez-Esqueda's previous arrest for alien smuggling in 2001.

5   Agent Perez initially confronted him about the arrest in the bedroom after calling in the record

6   check. Ramirez-Esqueda did not seem distressed by the confrontation, as he admitted the arrest

7   and stated that he had been released. When Agent Perez questioned him in the driveway, Agent

8   Perez again asked about the previous arrest for smuggling, and asked him if he was doing it again,

9   at which point Ramirez-Esqueda said, "Yeah, I work for him, and I check the checkpoint just to see

10  if it's up or down, and I get paid $100." (Govt. Ex. 8 at 678). During this exchange, Agent Perez

11  did not tell him that they had discovered the illegal aliens in Unit 4, nor that anyone had been

12  arrested. He did not inform Ramirez-Esqueda of his knowledge regarding Reyes-Bosque's

13  criminal record, or that Reyes-Bosque had been identified to Border Patrol previously as a possible

14  smuggler. In fact, the agent did not mention *any* evidence that had been collected with respect to

15  the charges that were eventually filed against Ramirez-Esqueda. The Court therefore finds that this

16  factor does not support an inference of a custodial interrogation.

17          The third factor the Court will consider is the physical surroundings of the interrogation.

18  Ramirez-Esqueda was initially questioned in the bedroom of Reyes-Bosque's home, then brought

19  to the living room, and outside in the driveway. In considering the physical surroundings, the

20  Court first finds it important to note that at no point was Ramirez-Esqueda physically restrained.

21  He was not handcuffed, nor was he locked up in a separate room. Although even if he had been,

22  this would not automatically create a custodial situation. *See United States v. Bautista*, 684 F.2d

23  1286, 1289 (9th Cir. 1982) (holding that use of handcuffs during a *Terry* stop is permissible, and

24  does not turn the stop into an arrest); *see also United States v. Cervantes-Flores*, 421 F.3d 825, 830

25  (9th Cir. 2005) (use of handcuffs justified and did not convert *Terry* stop into arrest). In addition

26  to not being physically restrained, Ramirez-Esqueda was questioned in a private residence, and

27  immediately outside of the residence. He was not in a traditionally custodial setting, i.e., a police

28  station. The surroundings could not be considered physically uncomfortable, because Ramirez-

1  Esqueda claimed he was staying there overnight, visiting his friend. The fact that he was
2  questioned in a private residence, where he claims to have been staying as a guest, weighs against a
3  finding that he was in custody. *See United States v. Eide,* 875 F.2d 1429, 1437 (9th Cir. 1989)
4  (giving substantial weight to the fact that questioning took place in a private residence when
5  deciding *Miranda* warnings were unnecessary).

6        The fourth factor for the Court's consideration is the duration of detention. The agents
7  were unsure of how much time passed, and the defendants argue it was approximately 30-40
8  minutes. The Court will therefore assume 30-40 minutes. Defendant Ramirez-Esqueda argues that
9  the duration of the detention was sufficient by itself to convert the situation from investigatory to
10 custodial. The Court disagrees. In *United States v. Sharpe,* the Supreme Court reiterated its
11 previous rejection of a hard and fast time limit for a *Terry* stop. 470 U.S. 675, 686-87 (1985).
12 Instead, the Court endorsed an approach where the court would examine "whether the police
13 diligently pursued a means of investigation that was likely to confirm or dispel their suspicions
14 quickly, during which time it was necessary to detain the defendant." *Id.* That is exactly what
15 happened here. During the time that Ramirez-Esqueda was detained, the agents were investigating
16 three suspects in two separate units on the premises. They were also dealing with approximately
17 twenty illegal aliens in Unit 4, and the arrest of Reyes-Bosque's wife for immigration violations.
18 Considering the amount of activity taking place, the 30-40 minute detention strikes this Court as
19 rather expeditious.

20       Finally, the Court considers the degree of pressure applied to detain Ramirez-Esqueda. As
21 discussed above, Ramirez-Esqueda was not handcuffed, nor otherwise physically restrained. He
22 was told by Agent Perez to come with him, and then to go outside so they could talk. He was not
23 threatened or spoken to in an abusive manner. Nobody attempted to trick him into staying. In
24 sum, minimal pressure was applied to detain him.

25       In applying the above five factors to the questioning of Ramirez-Esqueda at 362 Wilson
26 Ave., the Court finds that all factors weigh against a determination that he was in "de facto
27 custody" or that he was subject to "restraint on freedom of movement of the degree associated with
28 a formal arrest." *Stansbury v. California,* 511 U.S. at 322. Agent Perez therefore was not

05CR2239 BEN

1  obligated to administer *Miranda* warnings before questioning Ramirez-Esqueda, and his

2  statements made at 362 Wilson Ave. are admissible.

3      Defendant Ramirez-Esqueda also argues that his statements made post-*Miranda* at the

4  Border Patrol station should be suppressed as fruit of the poisonous tree.  Because the Court has

5  found no violation of Ramirez-Esqueda's constitutional rights, the post-*Miranda* statements made

6  at the station are clearly admissible.

7      D.      *Arrest of Reyes-Bosque and Post-Arrest Statements*

8      Defendant Reyes-Bosque challenges his arrest without a warrant as well as any post-arrest

9  statements.  An arrest without a warrant is valid if the arresting officer has probable cause.

10  Probable cause exists when "at the moment of arrest the facts and circumstances within the

11  knowledge of the arresting officers and of which they had reasonably trustworthy information were

12  sufficient to warrant a prudent man in believing that the [defendant] had committed or was

13  committing an offense."  *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980) (internal

14  quotation and citation omitted).

15      At the time the agents arrested Reyes-Bosque, he had been incriminated by Ramirez-

16  Esqueda's statement that he was watching the checkpoint for "him", which the agent reasonably

17  understood to refer to Reyes-Bosque.  Additionally, the agents had discovered approximately 20

18  undocumented aliens being held in Unit 4, and when they searched Unit 4, discovered suspicious

19  driving directions signed by "Emilio".  Further, they were aware of Reyes-Bosque's criminal

20  record and previous involvement in alien smuggling.  And finally, when agents questioned Rivas-

21  Pozos, who had been identified as the caretaker by the material witness, he brought them not to

22  Unit 4, but to Reyes-Bosque's home, thereby cementing a connection between Reyes-Bosque and

23  the smuggling activity taking place in Unit 4.  Taken together, these facts and circumstances are

24  sufficient to create probable cause.  Reyes-Bosque's arrest was therefore valid.  There is no dispute

25  that Reyes-Bosque received proper *Miranda* warnings.  Any statements he made after arrest are

26  therefore also admissible.

27      Finally, Reyes-Bosque challenges the length of time from arrest to a probable cause

28  determination.  Reyes-Bosque was arrested on Friday, December 2, 2005 between 9:30 and 10:30

05CR2239 BEN

1   a.m. The probable cause statement attached to the Complaint in this case indicates it was signed

2   by Magistrate Judge Leo S. Papas at 5:52 p.m. on Saturday, December 3, 2005, which was

3   approximately 32 hours later. During that time, the agents processed 21 undocumented aliens, as

4   well as three suspects. There is no indication in the record that they created any unreasonable

5   delay. The Court finds that the probable cause determination was made in a reasonable amount of

6   time.

### IV. CONCLUSION

8        For the reasons stated above, the defendants' motions to exclude evidence and statements

9   resulting from the searches and arrests at 362 Wilson Ave. are denied.

10        IT IS SO ORDERED.

11   Dated: November 20, 2006

                                    HON. ROGER T. BENITEZ
                                    UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

05CR2239 BEN